Good morning, your honors. You want to get that closer to you, okay? Thank you. Good morning, your honors. Mara Boundy for appellant Mr. Dennis Maric. I will reserve two minutes of my time for rebuttal and I'll keep an eye on it. Timing is everything. Considering only the facts the deputies knew at the time they entered Mr. Maric's home and arrested him, the law compels one result. There were no exigent circumstances. In addition, Could I ask you a question right up top about what they knew? Forgiving for my early interruption, but there's this, I think there's an unstated assumption in the record, but maybe you can help me. I understand what the telephone call was, the 9-1-1 call, and I understand that the dispatcher typed, you know, that the officers received a written statement, summary, that left out the one salient fact about the person fearing for her safety. But am I correct that that's all they received and they did not also receive any kind of, you know, audio or radio traffic communication from the dispatcher to the officers? That's correct, your honor. Based on the two declarations from Valerie Reese and I believe her name is Denise Osana in the record, who are the two dispatchers on call that evening, they transmitted over the computer-aided dispatch system a brief summary of the 9-1-1 call. It did not state anything about Ms. Merrick fearing for her life. To the contrary, it only relayed that Mr. Merrick was allegedly drunk, breaking property, and that CAD dispatch transmission also stated specifically that there was no physical altercation. Okay, so that's the part I know, forgive me, that's the part I know, and my question is, I just want to make sure that that is all they received. They didn't, they did not have any radio traffic, you know, oral traffic between the dispatcher, is that right? That's correct, based on the record, your honor. None of the deputies stated that they received radio transmission or any other communication beyond the computer-aided dispatch. Thanks very much. Ma'am, so the feared for her life part of this, as I understand it, is in dispute. Some of the, a couple of the officers said that they heard that, or what is the deputies did submit declarations to the district court stating that they were aware of this fact, but that is contradicted by the dispatcher's own declarations that they did not transmit this fact based on their statements of what they did transmit. Okay. The district court did not appear to consider the fact or the allegation that Ms. Merrick may have reported to 911 that she was fearing for her life. Well, it was in dispute, obviously. Yes, yes, your honor. And it did not appear to factor into the court's analysis of whether the circumstances were exigent, which is proper based on the record. However, Would it have been, the result would have been different, had, or should it have been different? Could it have been different if, indeed, that was part of the record that she had said she, Ms. Merrick, had feared for her life? It's possible, but based on this court's precedent, it probably would not have tipped the analysis. If we look at the facts of Martinez, Harris, and Hopkins versus the city of Sierra Vista, in each of those cases, we had 911 calls that were reporting actual violence. And then when the officers arrived on the scene, the house was quiet, or they could visibly identify the victim, see that she was physically unharmed. And so the idea that the fact that Ms. Merrick could have feared for her life at one point still would have been weighed against the fact that when the police officers here arrived, the house was quiet, they could see Ms. Merrick and her children, there was no signs of a domestic dispute. No, pardon me. Wasn't there a door to the bedroom that Mrs. Merrick had locked, which Mr. Merrick had broken down to the bedroom? And wasn't there, in the police reports, damage to property reported? In the CAD transmission, Your Honor, you're correct. There was a report of breaking property, but at the time that the deputies arrived, they didn't see any broken property. The damaged door that Your Honor notes was discovered by, I believe, Deputy Burke, after he entered the house, after Mr. Merrick was restrained and arrested in his front yard, and was doing a search of the property. So the fact about the broken door was not known to the deputies at the time that they arrived at the house. All they knew was broken property. He was breaking property inside the house. Yes, and he was drunk. I don't know if we mentioned that. Wasn't that part of the CDAC as well? Yes, it was part of the CDA. But Your Honor, I bring your attention to... Hold it, hold it. Excuse me. Before you go past this, you just said that the broken door wasn't known to them when they arrived at the house. It wasn't known to them when they entered the house, was it? No, it was not, Your Honor. Okay, so it's an important point. It's an important point for me. I'm not concerned about when they arrived. I'm concerned about when they stepped across the threshold. And just to be clear, my understanding from the record is that door wasn't visible. Is that right? That is correct, Your Honor. And he wasn't arrested for damaging property, destroying property, right? He was not. He was arrested for the misdemeanor of child endangerment and the misdemeanor of resisting a police officer. And it's appellant's position that probable cause was lacking on both of those crimes. First, as to... The misdemeanor resisting a police officer or failing... Was it resisting or failing to obey an order? It was resisting a police officer under Penal Code Section 148, Your Honor. And is that conduct the conduct of refusing to step out of his house? What is the conduct? Yes, Your Honor. Although it is refusing to step out of his house and refusing to, according to appellees in their answering brief, allow the deputies to enter the house and talk to him, the California Supreme Court and people v. Wetzel have stated unequivocally that standing at the doorway of your own home and refusing to allow an officer to enter your home without a warrant does not constitute resisting arrest or resisting a peace officer under Penal Code 148. You know, ma'am, you're raising... When you raise that, I have a question. I didn't see it anywhere, but this whole notion of the fact that he was estranged, as I understand it, that in the call it was, she said, a strange husband, estranged seems to suggest that they weren't living together. Now, nothing seems to have been made of that, but if he wasn't living there, query whether he had the right to not exit the house when the police asked him to. Can you speak to that a little bit? I can a little bit, Your Honor. You're correct that there's not a lot in the record as to the status of their relationship, and there are some facts that would suggest it's strained. But I guess what I'm getting at is the police thought it was estranged. Putting aside for the moment the reality, whether there was standing to make a Fourth Amendment claim, I'm not so much raising that issue, but I'm really raising the issue of what they knew at the time. And they knew he was estranged. Now, I didn't see that they argued that anywhere. But as soon as I saw estranged, I thought, is it his house? Is he living there? Because estranged often means, maybe usually means, they're separated. Based on the facts that are in the record, it appears he was living there. Indeed, Ms. Merrick's additional testimony to Deputy, I believe, Burke, whoever she gave her statement to after, suggested that he was sleeping there on regular occasions, that they had a practice of being together, and she described their ongoing relationship and some of the strain in it. Okay. So the police didn't know that initially when they got there? They did not initially, but Your Honor is correct that neither at the district court level nor on appeal have appellees argued that the fact of the estrangement indicated to them that Mr. Merrick lacked the consent to refuse their entry to the home. He was not arrested for a trespass? No, Your Honor, he was not. Why do you think that being drunk and breaking down a door to a bedroom does not inflict emotional harm to children who are in the house and therefore constitute probable cause for 273 child endangerment? Your Honor, it's not that breaking a door could never constitute child endangerment, but we have to consider both the California Courts of Appeals interpretation of 273 AB as well as the facts that the deputies knew at the time they decided to arrest Mr. Merrick without a warrant. Again, they did not know about the broken door at the time that they arrested Mr. Merrick for child endangerment. They learned about that after. And the facts that they did know do not rise to the level of, quote, serious domestic was at the scene that the California Court of Appeal requires to state a claim for child endangerment. What the police. Yes, excuse me, forgive me for interrupting, but you raise a good point. If they couldn't see the broken door, but they arrested him for destroying property. What do we know about what they knew? What property were they arresting him for? There's no evidence in the record that the deputies saw any broken property when they entered the home. The broken door is the only evidence of broken property in the record. But did they? So there wasn't allegations about other things having been thrown around or no broken glass on the floor. No, I can't. I don't see that anywhere. No, Your Honor. That's correct, Your Honor. It's not door. And it's just the broken door and the broken door wasn't visible when they entered. Is that right? That's correct. But did they? They did not arrest him for destruction of property, did they? No, they did not, Your Honor. Child endangerment and resisting a peace officer. And wait a minute. But I thought the basis, going back to Judge Bea's point, is that had the children witnessed destruction of property, that would have formed the basis of the child endangerment. Yes, Your Honor. Okay, thank you. But there's no evidence in the record suggesting that the officers knew at the time of the arrest, the children had witnessed that. Weren't the children frowning and holding on to their mother on the couch? They were frowning, but that could be read multiple ways, Your Honor. And the district court even noted that, that perhaps they were frowning because the police were at their house late at night. That's an argument. But the question is, was it sufficient for a reasonable police officer to think that the child or the children were impressed by the antecedent events of breaking down the door? Not based on the facts that they knew at the time, Your Honor, because again, they did not know about the door. And drawing that conclusion would require the deputies to ignore the fact that the dispatcher had told them. But when did they arrest him? Didn't they arrest him after they found out about the door? No, they had arrested him immediately upon entering the house. Mr. Merrick refused to allow them to enter the home without a warrant. Two deputies crossed the threshold, grabbed both of his arms, brought him out into the front yard, handcuffed him and executed a leg sweep, leaving him on his front lawn for about 20 minutes before sending him to the county jail. But the police, is it not reasonable for the police to have been concerned? Because one thought is, why didn't the police question her? Which was, which we will, I will ask your adversary here before they took the next step of taking him out. But isn't it, wasn't it reasonable to think that the children and the mom, this is a woman who had just called the police and now she's sitting there mute on the sofa with her children holding on to her. I mean, isn't it reasonable that they would be concerned about her feeling intimidated by the man who's now at the door saying, I guess, something to the effect, we don't need you or everything's fine? Wouldn't that have been a reasonable reaction by the police? It may have been reasonable, Your Honor, but it does not excuse the requirement for them to get a warrant or prove exigent circumstances. And so the, if we look at this court's decision in Hopkins, there, the defendant appeared at the door drunk. An officer was responding to a call that a woman had been beaten and screaming in the apartment. The loud noises were coming from the apartment. The officer asked to speak with the wife and the husband said, no, she's sleeping. You can't. The officer crossed the threshold. Yes, Your Honor. No, I didn't mean to. I appreciate, I think we know the facts of that case. It's well briefed. But when I look at the dispatcher's declaration, going back to the question earlier asked by my colleague, it says the complaining witness states estranged husband. So to my mind, a police, a reasonable police officer would think that he doesn't live there, that they're separated. A strange husband, drunk and breaking, complaining witness's property. She wants him sent on the way. So it goes back to the trespass idea. If the police officers were incorrect, but understood that he didn't live there and that he was drunk and that she'd asked him to be removed, could they have done what they did here? If that was actually the police officer's reasonable belief that he was an intruder. But the record does not support that, Your Honor. None of the deputies testified that they understood Mr. Merrick not to have a right to either not consent to the search or to be in the home. But they said this other thing, and that's what we're struggling with, I think, or at least for my part, they said, which seems to be unsupported, that they understood she feared for her life. And they didn't, as far as we can tell, they didn't know that fact. That's correct, Your Honor. They did not know that fact. And the deputies have not explained why or how the facts of the estrangement as relayed by the dispatcher factored into their decision at all based on the. You said they didn't know they feared for their life. I apologize, Judge Kristen. I just want to be sure of this. I, I thought the police somewhere along the line, somebody said they thought she had reported that she feared for her life. In their declarations to the district court, Your Honor, the deputies do state that they believed that, but that's impossible based on the contradictory evidence in the record that that fact was not relayed to them. Okay. But to me, I would say that's a fact in dispute, not a fact that's not true. Is that fair? It's in dispute, Your Honor. Yes. Thank you. Remaining time for rebuttal. Thank you. Thank you, ma'am. Sorry. Good morning. Good morning. Your Honor, uh, first I'd like to say, uh, it's an honor to be before the court and on behalf of county council and the president. I'm going to, I'm so sorry, sir. But again, maybe my hearing a little bit, but just get a little closer and I'm sorry. Can you hear me better now?      State of the court, thank you for having me. And it's an honor to be here on behalf of the county council's office in Fresno, as well as the sheriff's office. Um, we're, we're honored to present this argument. Uh, I'd like to address a couple of things here that seem to be an issue with the court. Um, the first thing is in the record, it is true that the deputies did testify or declare in their declarations in support of summary judgment that, um, they did know that there was a door that was broken and that property of the, of the caller was being broken or had been broken and that she wanted him removed. Excuse me, when, excuse me, that that's so helpful to me. When did they know that? How can we see in the record when they knew about the door? So, so by my estimation, if you look at the declaration. Yep. I've got it right here. All right. Let's look at the declaration of, uh, it's actually a 68 in the record. Your Honor, that's Valerie Reese. The other declaration from the first dispatcher is at one, uh, one 31. Uh, okay. And you'll see that the first dispatcher is the CAD operator. All right. She, she takes, she takes down the CAD information and, and relays that to a second dispatcher. That second dispatcher at 68 in the record is Valerie Reese. And Valerie Reese testified while she didn't expressly state that, yes, I and that the caller stated the door was being broken. She says, I, I, it was obviously some time after, uh, after the incident. So she stated that I would, my practice would have been to communicate all critical information to the officers via radio. So you see there at line 24 on page 68, she was assigned a radio dispatch. I believe that the record supports that the officers did receive a radio call and that is supported by their declarations where they turn around and they testify, Hey, door being broken down, callers in fear for her life. Property is being broken. That's why this was my first question. I'm, I'm struggling with whether they only got the typed words and I see this, um, statement in the, in the, the declaration of Ms. Reese. And so when I go back to the officer's declarations, uh, which I just closed, wait a minute, sorry. Here they are. Um, is your, is, is your theory then that the officer's statements that they knew or thought they knew that this person was in fear for her life, personal safety, that that comes from a radio transmission? Yes, Your Honor. Obviously there's some speculation involved in that given the, given the fact that the radio dispatcher simply testified that she communicated all relevant information. However, when you couple that with the, with the declarations from the officers, at least officers, deputies, Maldonado and Robinson, they testified to that. They declared that. So I take it at face value. I know that the court did not expressly address their knowledge of that issue. I will also say at this point that I don't think it matters that they had that tidbit of information. Certainly the record supports that they very well may have, but I don't think that that's dispositive. Um, and certainly... You speak to the last point, assume, assume they didn't, if you would, and tell me why that would not matter. I, I'm sorry, you said assume that they did not? Yes. You told me you think it doesn't matter. And so I'm interested to hear why you think that would not matter. I don't think it matters, Your Honor, because the district court, number one, didn't expressly address it in its findings in, in finding in favor of the, uh, uh, deputies in summary judgment. They had enough information. Let's look at, let's assume they didn't know that. Let's look at what else they had. Is the that just the door? Is that what the that is that you're both talking about? Just the door? Yes, Your Honor, the door. And I will say also that she was in fear for her life. So there's two, two facts. Yeah, I wasn't speaking about the door. I was talking about her statement about her personal safety. And when you said you didn't think that mattered, I, that's what I meant. I'm getting to that just, just now. So I don't think it matters because I wanted to, to examine what they did know. All right. And this is why it doesn't matter. What they did know is a 911 call, okay. A estranged wife. And we can talk about what that means. Estranged husband. Exactly. Vice versa. Yes, Your Honor. Um, that he was estranged from her. That was reported by the caller. Um, you know, I can take that to read that, uh, um, you know, they're, they're, they're intermittent in their relationship. Not necessarily that he wasn't living there, but although that's a, that's a, certainly a valid, um, possibility as well. I don't think that matters either, other than to the extent that the officers knew something's going on in that relationship. All right. I coupled that with the 911 call with information that property is being broken and specifically her property. Um, also that, um, uh, he's drunk and she wants him gone. All right. Now, obviously that's what they knew at the time. You couple that with the information that we've all learned after the fact and what the actual 911 call, um, it just confirms that. But, but as to the officer's knowledge, that's what they had when they arrived. Okay. Then we also have another situation developing, which is what they developed, the facts that they developed at the point that they were at the door talking to Mr. Merrick prior to entry. And it's very important to understand this. At the time, prior to their, what I consider to be, I guess for, for, for purposes of this argument, the seizure or the arrest in this case being the arms, if you will, and perhaps a foot over the threshold of the apartment's door, okay, he was clearly standing at the door within the swing of the door, um, by all indications. Now the intrusion by the officers was very minimal to go across it, but that's what I consider the breaking point with their knowledge prior to that, prior to reaching across what did they develop at that point, in addition to what they had when they arrived by the dispatch, they observed a, uh, the, the woman, the 911 caller, a caller with children. And I would submit that children at this moment are a new factor for the officers. They were not, uh, uh, they were not informed that there were children present through either the CAD or all information, uh, uh, would, would, uh, support that they were told over the radio. They didn't know there were children involved until that moment. They're still outside. They see children clinging to the mother, to the 911 caller. She's silent. Moments ago, and, and, and, and, and this reminds me, I think they arrived at 1159 PM, if you look at the CAD reports of both officer Maldonado and Robinson's, uh, unit patrol CADs, 1159 or thereabouts. If you look at the, uh, an entry or two later, it says, I think 1207, midnight 07, uh, one detained, one detained. So from the, from the moment of 1159, when they arrived moments later, really in, in, in, in that developing situation, he was detained. So this is a rapidly developing domestic violence situation, which the officers knew and drawing from their experience, they knew going into this before they even got there, this is a domestic, uh, potential domestic dispute. So prior to entry, this is the information that they're armed with. They see the children. They see the wife. They're frowning. It's undisputed. All right. Uh, the district court found. The officers were in uniform. Is that right? Absolutely. Yes. Yes. Fully uniformed, uh, obviously armed, uh, typical deputy situation, uh, patrol deputies, um, two of them at the door at that time, uh, talking to Mr. Merrick, who the evidence supports was immediately, uh, abrupt in the change of his, what, what we can say was a calm tone, uh, during the first few seconds of the conversation, but that immediately changed and he became aggressive. He was intoxicated. The officers confirmed these signs of intoxication, all of this prior to entry, but after the CAD and the radio dispatch. So these are, these are factors being developed by experienced patrol officers on the scene of a domestic violence dispute, and they are intentionally taking this information in. This is what they saw. Drunk, and that was reported by the way, uh, your honor, as your honor stated, drunk, intoxicated, breaking property, standing at the door, now that he did not want to come outside, which in the officer's experience is amply supported by the record is the, uh, law enforcement's technique. Okay. Tried and true. Separate these individuals so that we can get a handle on this situation. In my opinion, this is all about securing the scene, your honor. And, and, and our court... Mr. Hawkins. Yes, sir. There are mere presence there. Yes, your honor. With a man standing in the door. Didn't that secure the scene? Uh, I would say no in this particular case. What, what stopped them from saying, if you won't let us in, we'll apply for a warrant so that we can come in and arrest you and we'll keep an eye on you so that nothing happens to the woman or to the child whilst we're here. That's a great question. And, and let me answer it. Let me answer it this way. Again, let me, let me re refocus you on the amount of time that we're talking about here, minutes, less than six minutes. Counsel, this is, this is not a persuasive argument. It's seven or eight minutes. That's a long time. They could have asked her to come outside. So Judge Bea's question is exactly my question. They have to have probable cause and I haven't heard it. All right. So if the idea is to keep them separated, they've got a much easier, um, much more constitutionally, um, uh, permissible way to do that. So in the officer's, um, declarations, what they stated was that they were trying to get a handle on Mr. Merrick and calming him down and, uh, repeatedly asking him to step outside so that they can interview again with the intent to separate them. He refused to do the probable cause. What I'm just really trying to focus it. What was the, what was the probable cause for the fourth? Right. So the, the, the probable cause obviously was the exigent circumstances and the, the one 48 and the two 73, which was found by the court. And I'm just getting to that judge. Just give me one second. Okay. Okay. Um, okay. So, so what we have here is the officer's trying to calm Mr. Merrick down in doing that. They repeatedly asked him to come outside, which he refused. Okay. One 48, the, uh, the, the district court found that PC one 48 and as stated in the, in the citations in and of itself may not provide probable cause. If that's all you're looking at is a person's passive refusal or exercise of a fourth amendment, uh, right. If you will, to re to, to decline, to step out of their dwelling home of their house in and of itself, that won't form the basis of a one 48, let's assume that. All right. That's not what we had. You have to couple information that we had coupled with the fact that the court specifically found that he was impeding and the case law supports you can, you can decline consent, but you can't impede a lawful investigation. The lawful investigation was the officers had a duty to look into this domestic violence situation. They could not have, and this court has opined in other cases, it probably would have been a dereliction of duty at that moment to turn around and say, we're leaving, but here's what happened. Mr. Merrick, uh, attempted to shut the door. All right. And, uh, officer Robinson, deputy Robinson had to stick his foot in the door. All of a sudden it became a different situation. There is testimony in the record where he stepped back toward the family. And at that moment, I would say, in addition to observing the issue of the children, and we know that two 73 is the misdemeanor version of the, of the child endangerment, it just says that a child must, uh, a reasonable belief that the child is in a state of emotional distress. So as opposed to the felony version, which is the a two 73, a, this was two 73. So you're saying that, uh, Mr. Merrick went from the door being open and talking to the officers and got more aggressive and then went to shut the door. Is that in the record? Yes, Your Honor. That, so that he went to shut the door and that's when the police officer put his foot to prevent the shutting of the door. That's correct. And the deputies testified, uh, if you will declare it in their, in their support for summary judgment, that that was Academy 101 in terms of a domestic dispute. But when I can understand, obviously they want to separate the parties that are in dispute. Why not? And I think, uh, I think Judge Bea asked this the other, the other moment, why not take the mom and the children out? Why not say, Ms. Merrick, uh, please step outside. I'd like to talk to you. Good, good question. Um, I think they were concerned and I think, again, we're talking about the facts of this case and obviously in hindsight, now this is what the officers, in my opinion, were, were, were thinking through the, through the declarations. We're focused on Mr. Merrick, who's become aggressive, belligerent, he's drunk, he's intoxicated. They were focused on controlling him and the immediate scene between them. He was between the 911 caller and the children and the officers. So at any moment, as we know, in domestic violence situations, they had a situation  hostage situation or something worse than they were already encountering. So that was the deputy's focus. The foot goes in the door within, within seconds. Uh, Mr. Merrick, according to the officers, two officers stepped back toward the family. That coupled with what they observed to be, um, children in distress and a reasonable assumption, and the court also noted this, that those children witnessed some form of domestic dispute. All right. And we know if we skip ahead, but, but what happened, but what Mary testified to, but again, folks trying to focus on just what they knew at that moment. Here, they have a situation where now we have to control it. The, the actions of the officers at that split second moment was to make a decision, reach across the threshold, actually control Mr. Merrick with the least amount of reforce, uh, possible. Remember, they didn't have weapons drawn. They didn't mace anybody. They didn't tase anyone. None of those weapons were even presented to Mr. Merrick. It simply was a developing situation that the officers had to make a split second, uh, decision in, in time, in, in terms of controlling him at that moment, which they had reasonable grounds to believe that in that situation, in their training and experience, they had not let him go back inside. So they grabbed him, escorted him out. Everything after that is in the record. And we're really not here to talk about that, in my opinion. So. Can you point out to me anything in the declaration of Robinson, Maldonado, Alvarado about a foot in the door? Yes, Your Honor. And I also believe it's in their, in their report, uh, that's attached to the declaration, but let me grab that for you. Because I see what I see here is that, um, um, they also stepping back towards, I'm, I'm taking a look at Robinson. Um, I asked Dennis several more times to step outside. He started to walk backwards towards Mary and the children. I don't see anything about a foot in the door. Let me, let me just one second here. Um, when I was at my desk, I had my searchable PDF, so I'll, I'll have to just look here. Let me grab his report. Alvarado says he continued to stand on the interior side of the door threshold, notwithstanding the request for him to exit the apartment. I don't see any foot in the door. Yeah, I don't see it. Um, uh, with, uh, I, I, I could promise you I read it. I just can't lay my hand on it here. Let's see. I'm happy to, uh, provide that information to the court after this hearing, if necessary, it's, it's here, Your Honor. Uh, uh, man, Alvarado, I don't think it was in Alvarado's. I'm taking you past your time. Thank you very much. Uh, we'll give you a minute for rebuttal. Thank you, Your Honor, very much. I appreciate it. Before you get into your one minute, let me ask you this, what remedy do you want from us, particularize it? Yes, Your Honor. Appellant requests that the district court reverse, excuse me, this court reverse the district court on the claims of the fourth amendment arrest and entry to the seizure of Mr. Merrick, um, California constitution claim, article one, section one, which provides protections coextensive with the fourth amendment, as well as the California tort law claim of false imprisonment, absent probable cause the arrest of Mr. Merrick was false imprisonment. And what do you expect to happen below if this court were to do that? Well, Your Honor, um, it depends on this court's instructions. If it finds that the undisputed facts in the record support that these, there was a fourth amendment violation and lack of probable cause as a matter of law, then the trial court would be able to determine damages. If, however, this court determines that there's a question of fact that needs to be determined prior to ruling on these issues, um, then that would also be for the district court to do. To have a jury trial. Yes, Your Honor. Specific interrogatories, uh, or whatever on certain facts. And then anybody wants to do a qualified, the court wants to do a qualified immunity analysis or something. That's correct. Your Honor, which the district court did not rule on. Your Honor, is that my one minute? No. Okay. We'll give you a minute. We'll give you another minute. Go ahead. Thank you very much. So I just wanted to, um, follow up on several points from my argument and a Pelley's argument. First judge Christian, I need to clarify. It appears from the record at 69 that Valerie Reese did operate a radio, um, and that was my mistake. At 69, she also states though, that, uh, she believes she transmitted only that no physical altercation was, um, reported and that he was drunk and breaking property. So it still appears, despite the presence of radio transmission, um, that the fact that Ms. Merrick may have feared for her life was not communicated to the deputies, um, before they spoke with Ms. Merrick after arresting Mr. Merrick. Um, in addition, uh, Deputy Burke specifically states that he actually reviewed the CAD transmission in his car. So he would have had that same information. Um, regarding what happened at the time of Mr. Merrick's arrest, based on my review of the record, neither Deputy Robinson's report nor any of the deputy's declarations suggests that they had to forcibly keep the door open. Deputy Robinson and Deputy, I believe Alvarado described Mr. Merrick taking a step backwards, but none of them described that situation as posing an imminent physical danger to Ms. Merrick. And this court has been exceedingly clear in the case of domestic disturbances that these do not create a per se exigency and particularly where the victim is visible and the officers can ascertain that there is no immediate threat of physical danger. Exigencies have not been found. Thank you, Your Honors. We thank, uh, counsel for their illuminating argument and, um, that takes care of the calendar for today. The court will stand adjourned.
judges: Bea, Christen, McLaughlin